[No. D019544. Fourth Dist., Div. One. June 20, 1996.]

KRISTA STONER, Plaintiff and Respondent, v.
BONNIE JO WILLIAMS, Defendant and Appellant.

COUNSEL

Dummit, Faber & Briegleb and Jeffry A. Miller for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

OPINION

**McDONALD, J.**—Bonnie Jo Williams (Williams) appeals a judgment entered following a jury verdict against her in a fraud action brought by Krista Stoner (Stoner). Williams contends the court erred by instructing the jury that it was not required to agree on the same fraudulent act provided at least nine jurors agreed that all of the elements of fraud were proved by a preponderance of the evidence. Williams also contends the court abused its discretion by allowing Stoner to introduce evidence supporting theories of fraud not included in the complaint. We conclude the court did not err and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Our summary of the factual and procedural background reflects our attempt to set forth an objective, concise background relevant to the issues on appeal. Stoner did not file a respondent's brief, and we are without the benefit of her factual summary and response to Williams's brief.[1]

On July 28, 1988, Stoner met Williams at the offices of San Diego Pregnancy Services, Inc. (SDPS). At that time, Williams was the director of client services of SDPS.[2] Stoner was then nineteen years old and three to four months pregnant. After being assured that everything she said would remain confidential, Stoner disclosed to SDPS her personal history, including problems she experienced as a teenager and her drug usage. SDPS arranged for a "host family," with whom Stoner lived during her pregnancy.

---

[1] California Rules of Court, rule 14(a) states: "Every respondent shall file a respondent's brief . . . ." (All rule references are to the California Rules of Court.) Rule 17(b) provides that if the respondent fails to file a respondent's brief, we "may accept as true the statement of facts in the appellant's opening brief . . . ." However, because of the apparent "slant" in the statement of facts contained in Williams's brief, we decline to exercise our rule 17(b) option. Rule 13 requires that appellants' briefs contain a concise and accurate statement of material facts. Our independent review of the record shows that Williams has not accurately conveyed a full, nonbiased statement of the facts. (See *In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 847, fn. 2 [21 Cal.Rptr.2d 642].)

[2] A few months later Williams became the director of adoptions of SDPS.

On October 19, 1988, Williams met with Stoner and discussed placing Stoner's baby for adoption. Stoner felt pressured to place her baby for adoption and was never told about other options. Before January 5, 1989, Stoner told various people, including Williams, that she had decided to place her baby for adoption. Williams also knew, however, that Stoner had said that if she had a baby girl on Christmas she would keep the baby. Williams never told Stoner about the difference between an agency adoption and an independent adoption, about a lawyer drawing up any kind of papers or about whether SDPS was a licensed agency.

On January 5, 1989, Stoner and Williams met in SDPS offices and discussed the possibility of adoption of Stoner's baby. Williams showed Stoner the files of three prospective adoptive parents, including Carson and Jennie Looney (the Looneys) from Tennessee. During this meeting Stoner's contractions began and Williams drove Stoner to the hospital. During labor at the hospital and after she had received medication, Stoner signed papers Williams placed in front of her with the explanation they were hospital forms for medical information.[3] Soon thereafter, Stoner gave birth to her baby.

During the morning of January 6, 1989, the Looneys arrived at the hospital. Stoner was released from the hospital before noon that day. Copies of the papers Stoner had signed were missing from her belongings when she arrived at her host family's home. Apparently the Looneys later left the hospital with Stoner's baby.

Within two weeks after Stoner gave birth, she changed her mind about placing her baby for adoption. She contacted Williams, who arranged for her to meet on January 19, 1989, with Attorney James Bunker (Bunker), who Williams said represented and helped both sides to the adoption. On January 31, 1989, Bunker sent Stoner a letter advising her that he did not represent her and that if she wanted her baby back she would have to retain a Tennessee attorney. Stoner ultimately was unable to regain custody of her baby and a Tennessee court notified her that her parental rights had been terminated on grounds of abandonment in an action filed by the Looneys in Tennessee. One document submitted to the Tennessee court in support of the Looneys' action was an affidavit by Williams which Bunker asked her to prepare, disclosing personal information about Stoner that Stoner had revealed to Williams and SDPS. Williams also had traveled to Tennessee where the Looneys' attorney deposed her in connection with their action.

Stoner filed this action against Williams and others alleging fraud, intentional infliction of emotional distress, negligence and negligent infliction of

---

[3]Those papers actually included a form authorizing the Looneys to remove Stoner's baby from the hospital and other documents related to effecting an interstate adoption.

emotional distress.[4] Her second amended complaint alleged, inter alia, the following intentional misrepresentations:

"a. that SDPS was a licensed agency fully authorized to provide and did provide pregnancy testing, and objective professional counseling services including accurate information on the full range of alternatives available to young, unwed, pregnant women when [in] truth and in fact SDPS was unlicensed and unauthorized by any governmental agency to provide such services;

"b. that any information given by [Stoner] was fully confidential and would not be used in a manner contrary to [Stoner's] interests, when in truth and in fact, [Stoner's] confidences were used against her in procuring the fraudulent adoption of her child;

"c. that [Bunker] represented [Stoner's] interests as he did other SDPS clients and would protect her interests, when in truth and in fact, [Bunker] had been retained by the [Looneys] to facilitate the adoption of [Stoner's] child;

"d. that the documents [Stoner] signed were mere formalities, that they provided for temporary placement of her child, and were for [Stoner's] benefit in that the [S]tate of California would assist her if there were problems with the adoptive placement, when in truth and in fact the documents [Stoner] signed provided her no protection."

The court subsequently granted SDPS's motion (joined by Williams) for summary adjudication of Stoner's claims for intentional infliction of emotional distress, negligence and negligent infliction of emotional distress, finding they were barred by the one-year statute of limitations. Stoner's action for fraud remained as the sole cause of action.

After trial, the jury returned a verdict of $275,000 against Williams for intentional fraud or concealment and also for negligent misrepresentation. The jury also found by clear and convincing evidence that Williams committed intentional fraud or intentional concealment.[5] Following the second phase of the trial, the jury awarded Stoner punitive damages of $375,000 against Williams. The award of punitive damages was later reduced to $25,000 in connection with Stoner's consent to a remittitur. Williams appeals the judgment against her.

---

[4]SDPS, Bunker and the Looneys also were named as defendants.

[5]The jury also found SDPS liable for intentional fraud or concealment, but not by clear and convincing evidence.

DISCUSSION

I

*The Court Correctly Instructed the Jury That Nine Jurors Did Not Have to Agree on the Same Fraudulent Act*

Williams contends the court prejudicially erred by instructing the jury that nine jurors were not required to agree on the same fraudulent act.[6] She asserts the court's response to the jury's note posing this question erroneously stated that nine or more jurors merely had to agree that each element of an action for fraud must be proved. We disagree with Williams's contention.

A

The court instructed the jury regarding the burden of proof with a modified BAJI No. 2.60 instruction offered by Stoner. The instruction read in part:

"The plaintiff, [Stoner], has the burden of proving by a preponderance of the evidence all the facts necessary to establish one or more of the following:

"1. SDPS, [Williams], or their employees or agents misrepresented to [Stoner] that SDPS gave 'Comprehensive Pregnancy Counseling' services on the full range of alternatives available to a woman in [Stoner's] situation.

"2. SDPS, [Williams], or their employees or agents concealed from [Stoner] the fact that they were an unlicensed adoption agency.

"3. SDPS, [Williams], or their employees or agents misrepresented to [Stoner] that they would be her advocate in representing her interests regarding the child.

"4. SDPS, [Williams], or their employees or agents misrepresented to [Stoner] that the information revealed during her initial interview and during her 'counseling' would be fully confidential and not used in a manner contrary to her interests.

"5. SDPS, [Williams], or their employees or agents misrepresented to [Stoner] that the papers she signed on January 5, 1989, while in labor had

---

[6] Our use of the term "fraudulent act" in this opinion means that element of an action for fraud consisting of false representation, concealment or nondisclosure. (See, e.g., Civ. Code, §§ 1709, 1710; *Masters* v. *San Bernardino County Employees Retirement Assn.* (1995) 32 Cal.App.4th 30, 40, fn. 6 [37 Cal.Rptr.2d 860].)

something to do with Medi-Cal when in fact they were a medical records authorization release and ICPC Form 100A.

"6. SDPS, [Williams], or their employees or agents misrepresented to [Stoner] that their counseling would not be coercive in terms of urging her to place her child for adoption.

"7. SDPS, [Williams], or their employees or agents concealed from [Stoner] that [Bunker] did not represent her interests, but rather, those of the [Looneys] in the adoption of [Stoner's] child.

"[Stoner] must also prove that:

"(a) One or more of the above listed items legally caused damage to [her]; and

"(b) The nature and extent of the injury or damage.

"[Stoner] must also prove the nature and extent of [her] damages legally caused by [Williams's] misrepresentations or concealment. . . ."

The court also instructed the jury with BAJI No. 12.31 regarding the six elements that must be proved to find Williams liable for intentional misrepresentation.[7] The court also instructed the jury that nine or more jurors must agree on the verdict.

After one day of deliberation, the jury sent the court the following note: "There are 7 allegations made by plaintiff (BAJI [No.] 2.60) which relate to the verdict questions. The instructions indicate plaintiff must prove by preponderance of evidence all facts necessary to establish one or more of the allegations. In order to answer yes, do a minimum of 9 jurors need to agree

---

[7]The court instructed the jury with BAJI No. 12.31 as follows:
"1. The defendant must have made a representation as to a past or existing material fact;
"2. The representation must have been false;
"3. The defendant must have known that the representation was false when made, or must have made the representation recklessly without knowing whether it was true or false;
"4. The defendant must have made the representation with an intent to defraud the plaintiff, that is, defendant must have made the representation for the purpose of inducing the plaintiff to rely upon it and to act or to refrain from acting in reliance thereon;
"5. The plaintiff must have been unaware of the falsity of the representation; she must have acted in reliance upon the truth of the representation and she must have been justified in relying upon the representation;
"6. And finally, as a result of her reliance upon the truth of the representation, the plaintiff must have sustained damage."
The court also instructed the jury with BAJI Nos. 12.35 and 12.45 regarding the elements of concealment and negligent misrepresentation, respectively.

that the same allegation[] has been proven or could some agree that one has been proven and others a different one as long as 9 agree that at least one has been proven[?]" After an extensive discussion with counsel, the court, over the objection of defense counsel, sent the jury the following response:

"(A) To find intentional misrepresentation, at least nine jurors must agree on each of the elements of [BAJI No.] 12.31[] or 12.40.

"(B) To find intentional concealment, at least nine of the jurors must agree on each of the elements of [BAJI No.] 12.35.

"(C) To find negligent misrepresentation, at least nine of the jurors must agree on each element of [BAJI No.] 12.45.

"(D) *It is not necessary that the same nine agree to the same [one] of the seven items listed in [BAJI No.] 2.60 as long as nine or more agree that all of the elements of one of the above numbered instructions [have] been met by a preponderance of the evidence.*" (Italics added.)

The jury reached its verdict soon after receiving these additional instructions.

In discussing the appropriate response to the jury's note, counsel for SDPS stated he believed that in order to find his client liable for fraud, at least nine jurors must agree on the same one or more of the seven possible fraudulent acts set forth in the modified BAJI No. 2.60 instruction. The court stated: "I don't believe that the law requires that they agree upon the same act. They must agree on each of the elements on the intentional misrepresentation, negligent misrepresentation, or concealment occurred, but they could have different acts of misrepresentations, for example, and all nine of them find that she negligently—or someone negligently misrepresented something to [Stoner] and it caused her damage." Stoner's counsel agreed with the court and stated: "The [*Resch* v. *Volkswagen of America, Inc.* (1984) 36 Cal.3d 676 (205 Cal.Rptr. 827, 685 P.2d 1178)] case is the case that says that." Stoner's counsel continued his argument stating, "they don't have to agree on what the theory of the misrepresentation was or what the facts of the misrepresentation are, as long as they find, at least nine of them find each of those elements in [BAJI No.] 12.31 or 12.35 or 12.45." The court made the following comparison: "I analogize it to an automobile accident case where you might have somebody who is speeding, improperly making a turn and maybe had a few drinks. And when the jury is asked whether the defendant was negligent, they can have different decisions. One can decide he was negligent because he was speeding and one can decide he was

negligent because of the turn issue. They don't have to agree on the same act. They have to agree that the act was negligent and that the negligence caused injury." Although the record does not reflect any objection by Williams's counsel, we presume SDPS's counsel objected on behalf of all the defendants to the court's proposed response to the jury's note.

## B

The issue is one of fundamental importance: on what must jurors agree in reaching a verdict? Surprisingly, we have been unable to locate, and Williams does not cite, any case or other authority which specifically addresses this issue in a civil case.[8] We do not have Stoner's assistance on this issue because she did not file a respondent's brief. Contrary to the suggestion of Stoner's trial counsel, the case of *Resch* v. *Volkswagen of America, Inc.*, (1984) 36 Cal.3d 676 [205 Cal.Rptr. 827, 685 P.2d 1178] (hereafter *Resch*) does not address the issue.[9] Thus, we consider the issue to be one of first impression.

## C

Code of Civil Procedure[10] section 613 provides in part that the jurors must be kept together during deliberations "until at least three-fourths of them agree upon a verdict or are discharged by the Court." Section 618 provides in part: "When the [jurors], or three-fourths of them, have agreed upon a verdict, they must be conducted into court and the verdict rendered by their foreman." Thus, at least nine of twelve jurors must, and in this case did, agree on the general verdict. However, the extent to which the jurors in a civil case must agree on the underlying specifics which lead to a verdict is not clearly set forth in any statute or case we have been able to locate. Must the jurors simply agree that all elements of a cause of action were proved or must they additionally agree on the same specific act (or acts) constituting a particular element of the cause of action? Because we have not found any civil authorities discussing the question, we refer to criminal cases for assistance.

---

[8] One court in dicta noted the appellant's contention that the jury could have found it liable for fraud under alternative theories of intentional misrepresentation or concealment, depriving it of a verdict of nine jurors on the same theory. (*Orient Handel* v. *United States Fid. & Guar. Co.* (1987) 192 Cal.App.3d 684, 700 [237 Cal.Rptr. 667].) The court, however, did not address the substance of the question of whether at least nine jurors were required to agree on the same legal theory in order to reach a verdict. Rather, the court simply stated that the appellant could ask for appropriate special verdicts upon retrial of the action. (*Ibid.*)

[9] *Resch* addressed the question of whether the same nine or more jurors had to agree on each of the special verdict questions. (*Resch, supra,* 36 Cal.3d at pp. 677-678.) The court concluded that different groups of nine or more jurors could participate and agree on different special verdict questions in civil cases in order to reach a valid verdict. (*Id.* at pp. 682-683.)

[10] All statutory references are to the Code of Civil Procedure unless otherwise specified.

■ Under CALJIC No. 17.01 and related case law in the criminal area, jurors must agree unanimously on the same act on which a criminal offense is based if there exist multiple acts on which separate criminal offenses could be based.[11] "A requirement of jury unanimity typically applies to acts that could have been charged as separate offenses." (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 92 [279 Cal.Rptr. 276, 806 P.2d 1311].) Thus ". . . when the accusatory pleading charges a single criminal act and the evidence shows more than one such unlawful act, *either* the prosecution must select the specific act relied upon to prove the charge *or* the jury must be instructed in the words of CALJIC No. 17.01 . . . or their equivalent that it must unanimously agree beyond a reasonable doubt that defendant committed the same specific criminal act." (*People* v. *Gordon* (1985) 165 Cal.App.3d 839, 853 [212 Cal.Rptr. 174], original italics.) However, if only one criminal offense could exist as a result of the commission of various acts, the jury need not agree on which particular act (or legal theory) a criminal conviction is based, provided the jurors unanimously agree that all elements of the criminal offense are proved beyond a reasonable doubt. As we observed in *People* v. *Davis* (1992) 8 Cal.App.4th 28, 34 [10 Cal.Rptr.2d 381]: "The *Sullivan* rule [*People* v. *Sullivan* (1903) 173 N.Y. 122 (65 N.E. 989)] takes as irrelevant any jury disagreement on subordinate issues. It matters not that jurors may disagree over the theory of the crime, for example, whether the situation involves felony murder or premeditated murder. Nor does it matter that they disagree on the theory of participation, for example, whether there was direct participation or aiding and abetting or coconspiracy. Nor does it matter that they disagree about the facts proving any of these theories. If each juror concludes, based on legally applicable theories supported by substantial evidence, that the defendant is guilty of the charged offense, the defendant is properly found guilty even if the jurors disagree about the particular theories or facts." We concluded in *Davis* that California decisional law generally follows the *People* v. *Sullivan* (1903) 173 N.Y. 122 [65 N.E. 989] rule and "does not require jurors unanimously agree on the theory supporting a conviction" although the jurors must unanimously agree on the specific offense. (*People* v. *Davis, supra,* 8 Cal.App.4th at pp. 40-41.) "While sometimes discussed in terms of the jury being required to agree on the 'act' committed by the defendant, this statement of the issue seems to be driven by the context in which the question generally arises. . . . What we

---

[11]CALJIC No. 17.01 provides: "The defendant is accused of having committed the crime of ____ [in Count ____]. The prosecution has introduced evidence tending to prove that there is more than one [act] [or] [omission] upon which a conviction [on Count ____] may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt that [he] [she] committed any one or more of such [acts] [or] [omissions]. However, in order to return a verdict of guilty [to Count ____], all jurors must agree that [he] [she] committed the same [act] [or] [omission] [or] [acts] [or] [omissions]. It is not necessary that the particular [act] [or] [omission] agreed upon be stated in your verdict."

conclude is actually required, however, is unanimous agreement that the defendant is criminally responsible for *one discrete criminal event.*" (*Id.* at p. 41, original italics.) We further concluded:

". . . In California it is unnecessary jurors unanimously agree on the theory of criminal culpability supporting their unanimous conclusion of guilt. . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . .

". . . [W]here there is a single offense and a single charge, it is the task of each juror to conclude, based perhaps on very different theories, whether the defendant is guilty or not guilty. It is simply of no consequence that some jurors believe the defendant is guilty based on one theory while others believe he is guilty on another even when the theories may be based on very different and even contradictory conclusions concerning, for example, the defendant's basic intent in committing the crime.

". . . . . . . . . . . . . . . . . . . . . . . . . .

". . . We therefore conclude the giving of CALJIC No. 17.01 is inappropriate in those cases where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event. We find CALJIC No. 17.01 an appropriate instruction when conviction on a single count could be based on two or more discrete criminal events. . . . [H]owever, the jurors need not agree on the theory of criminality or the theory of criminal participation." (8 Cal.App.4th at pp. 44-45.)

Our analysis in the *Davis* case was effectively the same as the California Supreme Court's subsequent analysis in *People* v. *Santamaria* (1994) 8 Cal.4th 903, 918-919 [35 Cal.Rptr.2d 624, 884 P.2d 81], as follows:

"It is settled that as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by which theory he is guilty. [Citations.] More specifically, the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator. [Citations.] This rule of state law passes federal constitutional muster. [Citation.]

". . . . . . . . . . . . . . . . . . . . . . . . .

"Not only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. Sometimes, as probably occurred here, the jury

simply cannot decide beyond a reasonable doubt exactly who did what. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other."

The court cited the following specific example in support of its reasoning: "In analyzing the unanimity question in a robbery case, one Court of Appeal used this example. ' "Assume a robbery with two masked participants in a store, one as the gunman and one as the lookout. If one witness makes a voice identification of the defendant as the gunman who demanded money, but other evidence, such as a fingerprint, suggests the defendant was actually holding the door open as lookout, the jury would be faced with the same theories presented in this case: find the defendant was the gunman and therefore a direct perpetrator, or find he was at the door and therefore an aider and abettor. Either way he would be guilty of robbery." If 12 jurors must agree on the role played by the defendant, the defendant may go free, even if the jurors all agree defendant committed the crime. That result is absurd.' (*People* v. *Perez* (1993) 21 Cal.App.4th 214, 222 [26 Cal.Rptr.2d 691].) Equally absurd would be to let the defendant go free because each individual juror had a reasonable doubt as to his exact role." (*People* v. *Santamaria, supra,* 8 Cal.4th at p. 920, fn. 8.)

In a single offense situation, a defendant who commits more than one act could receive more beneficial treatment if the rule were otherwise. The court in *People* v. *Perez* (1993) 21 Cal.App.4th 214, 222, noted: "[Under the contrasting position requiring unanimity regarding specific acts and theories,] the defendant who sits in the car and later enters the store, actually committing both acts, is not convicted if all jurors do not unanimously agree on at least one act. On the other hand, the defendant who only waits in the car or only enters the store does not have the advantage of splitting the vote. The result therefore rewards defendants who present evidence they committed more than one act, confuse the jury and then exploit that confusion when the jurors cannot agree."

Our California Supreme Court followed this approach long before the *Santamaria* case, and it held in one case that a unanimity instruction regarding the method by which a theft was committed was not required, reasoning: "If [defendant] intended that only possession of the property should pass at the time of the sale, defendant was guilty of larceny by trick or device, but if [defendant] intended that title should pass, defendant was guilty of obtaining property by false pretenses. [Citations.] Irrespective of [defendant's] intent, however, defendant could be found guilty of theft by one means or another, and since by the verdict the jury determined that he did fraudulently appropriate the property, it is immaterial whether or not

they agreed as to the technical pigeonhole into which the theft fell. [Citations.]" (*People* v. *Nor Woods* (1951) 37 Cal.2d 584, 586 [233 P.2d 897].) The court in *People* v. *Sutherland* (1993) 17 Cal.App.4th 602, 618-619 [21 Cal.Rptr.2d 752], similarly held that no unanimity instruction was required where jurors could have found the defendant guilty of forgery by alternative acts of either forging or uttering an instrument.

The vast majority of other state and federal courts apply the same unanimity standards as set forth in the *Davis* and *Santamaria* cases. (See, e.g., Annot., Requirement of Jury Unanimity as to Mode of Committing Crime Under Statute Setting Forth the Various Modes by Which Offense May Be Committed (1990) 75 A.L.R.4th 91.) As the court in *U.S.* v. *Anderson* (D.C. Cir. 1994) 39 F.3d 331 [309 App.D.C. 54] observed, ". . . *unanimity is required in the finding that each essential element* of the [criminal] offense *is satisfied, not in the subsidiary findings regarding the particulars of each element.*" (*Id.* at p. 351, italics added.) In a case involving a federal criminal fraud statute, the court in *United States* v. *UCO Oil Co.* (9th Cir. 1976) 546 F.2d 833 noted that the various acts which could constitute a violation of the statute did not necessarily result in separate offenses for multiple or alternative acts requiring juror unanimity regarding those acts, explaining: "It is reasonable to conclude . . . that Congress was concerned with proscribing the prohibited result rather than particular kinds of conduct. That being so, consistency calls for interpreting the enumeration of different kinds of conduct in the statute as reflecting different modes of achieving that result, not separate and distinct offenses. [Citations.]" (*Id.* at p. 836.)

Given this established law on jury agreement in criminal cases, we compare the criminal juror unanimity standards with the requirement that three-fourths of civil case jurors agree on a verdict.

### D

■ Although comparing civil law with criminal law is sometimes like comparing apples with oranges, we believe there are close parallels between required jury agreement in a criminal case and required jury agreement in a civil case. In both criminal and civil cases, the jurors must agree on something to return a verdict. Jurors in a criminal case must decide whether a particular criminal offense was committed, but generally need not decide specifically what acts the defendant performed in committing that offense. In a civil case involving a general verdict, jurors, at a minimum, must decide whether a particular cause of action was proved and, in so doing, must

decide whether each element of that cause of action was proved. However, it is unclear whether civil jurors must agree on what acts the defendant did to establish each element of a cause of action.

Generally, our criminal law system places greater burdens on the plaintiff or prosecutor to prove a case against a defendant than does our civil law system. For instance, the burden of proof is greater. In criminal cases, guilt must be proved beyond a reasonable doubt. In civil cases, liability generally must be proved by a preponderance of the evidence. Also, the jury vote requirements for a verdict are greater in criminal cases than in civil cases. In criminal cases, unanimous verdicts are required in California. In civil cases, only three-fourths of jurors need agree on a verdict in California. Also, the types of evidence admissible are generally more restricted in criminal cases than in civil cases. Thus, a pattern is established revealing frequently higher standards for plaintiffs in criminal cases than in civil cases. We are unaware of any significantly lower standards for plaintiffs in criminal cases than in civil cases. We therefore conclude that the answer to the question of jury agreement in civil cases should follow the rules of jury agreement in criminal cases and not be more onerous on the civil plaintiff than on the criminal prosecutor.

As discussed above, in criminal cases involving a single, discrete criminal offense jurors need not decide on the specific acts taken by a defendant or legal theories supporting a defendant's commission of that offense, but need decide only that the defendant is guilty of that offense as defined by law. Because the law may allow for alternative means of committing an offense, our criminal justice system does not require that jurors unanimously agree on exactly what alternative means or actions a defendant took in committing that offense. For example, it is not required that jurors agree that a defendant actively committed the offense or that he or she merely aided and abetted the primary offender. It is required that the jurors unanimously agree the defendant was involved in one or the other of those capacities to support a guilty verdict.

A different rule applies when the evidence reveals multiple acts which could support the finding of multiple offenses among which the information or prosecutor has not specifically differentiated. In these circumstances if the jury is given a verdict form asking it to decide whether a single offense has been committed, the jury may not necessarily know to which offense the verdict is directed. Accordingly, case law requires that CALJIC No. 17.01 or its equivalent be given. This instruction effectively requires that jurors agree on the "same criminal offense" rather than on the specific acts performed by a defendant in committing that offense. Thus, unanimous agreement on the ultimate, essential fact (i.e., commission of a particular criminal offense) is

required for the jury to reach a verdict, but agreement on the same acts the defendant performed in committing that particular offense is not required.

Returning to civil cases, we begin with the requirement that at least nine of twelve jurors agree that each element of a cause of action has been proved by a preponderance of the evidence. The elements of a cause of action constitute the essential or ultimate facts in a civil case[12] comparable to the elements of a single, discrete criminal offense in a criminal case. Analogizing a civil "cause of action" to a single, discrete criminal offense, and applying the criminal law jury agreement principles to civil law, we conclude that jurors need not agree from among a number of alternative acts which act is proved, so long as the jurors agree that each element of the cause of action is proved.

In civil cases in which there exist multiple causes of action for which multiple or alternative acts could support elements of more than one cause of action, possible jury confusion could result as to whether a specific cause of action is proved. In those cases, as in criminal cases in which separate criminal offenses are alleged or shown by the evidence, we presume that jury instructions may be appropriate to inform the jury that it must agree on specific elements of each specific cause of action. Yet, this still does not require that the jurors agree on exactly how each particular element of a particular cause of action is proved.[13]

E

Given that three-fourths of the jurors in a civil case must agree that each of the elements of a cause of action is proved, we must address the issue of whether the case at hand involved just one cause of action or multiple causes of action, which might warrant further jury instructions regarding differentiation. On the face of Stoner's complaint, only one "cause of action" remained after the court granted summary adjudication dismissing all other "causes of action." The remaining cause of action was for fraud. Based on Stoner's complaint, the jury was presented with the question of whether Williams was liable to Stoner for fraud. The existence of multiple legal theories or acts on which that particular fraud could be proved would not necessarily result in multiple causes of action.

---

[12]Evidence Code section 500 provides that a party has the burden of proving "each fact the existence or nonexistence of which is *essential* to the claim for relief" that he or she asserts. (Italics added.)

[13]Further, given the general verdict form in this case, we cannot presume the jurors actually disagreed on the fraudulent acts alleged by Stoner.

If, however, the seven alternative fraudulent acts alleged in the modified BAJI No. 2.60 instruction given by the court could support multiple causes of action for fraud, we presume a jury instruction comparable to CALJIC No. 17.01 (modified to civil law requirements) would be warranted. To determine whether there exist multiple causes of action, we look to the "primary rights" theory to ascertain whether multiple "primary rights" of Stoner were violated by Williams. ■ As our California Supreme Court stated, "California has consistently applied the 'primary rights' theory, under which the invasion of one primary right gives rise to a single cause of action." (*Slater* v. *Blackwood* (1975) 15 Cal.3d 791, 795 [126 Cal.Rptr. 225, 543 P.2d 593].) In determining whether more than one primary right is invaded, we look to the *harm suffered* rather than the legal theory asserted by a plaintiff. "[T]he 'cause of action' is based upon the harm suffered, as opposed to the particular theory asserted by the litigant. [Citations.] Even where there are multiple legal theories upon which recovery might be predicated, one injury gives rise to only one claim for relief." (*Ibid.*) In one recent case in which a client alleged professional negligence against its attorney, the California Supreme Court stated: "[The client] had one primary right—the right to be free of negligence by its attorney in connection with the particular debt collection for which he was retained. He allegedly breached that right in two ways, but it nevertheless remained a single right." (*Bay Cities Paving & Grading, Inc.* v. *Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 860 [21 Cal.Rptr.2d 691, 855 P.2d 1263].) Thus, the court concluded the client "suffered a single injury as a result of its attorney's omissions—the inability to collect the amount owed to [it] for its work on the construction project." (*Ibid.*) We note that the facts alleged in that case involved multiple omissions by the attorney defendant which allegedly led to the client's injury. (*Id.* at p. 858.) Each omission did not result in a separate cause of action. Rather, as the court noted, the single injury or harm suffered by the client resulted in a single cause of action despite the multiple omissions (or acts) by the defendant. (*Id.* at p. 860.)

■ Applying the primary rights theory to our case, we look at Stoner's injury (or harm suffered) to determine whether she alleged or proved separate injuries which would result in separate causes of action being stated. The record reveals Stoner effectively sustained only one "injury" as a result of the alleged fraudulent acts of Williams. Stoner's complaint alleged that she "suffered severe mental and emotional distress causing physical injury as a result of losing her child" and prayed for general, specific and punitive damages. In her trial brief she stated her "damages are clearly established" because she "has lost her child as a result of the trust and confidence she placed in SDPS [and presumably Williams]." In discussing damages during closing arguments, Stoner's attorney pointed to the fact that "this woman's

only child, the only one she has ever had in her entire life, has been ripped from her womb forever. It is doubtful that that child will ever know that this is her mother because we have the videotapes of [Jennie Looney] leaving the hospital in a wheelchair." He then concluded: "I don't know what the ceiling is, ladies and gentlemen, but if this was a death case, the floor would be a million dollars for the loss of the child. And this is worse, because when a child dies, you have a grave that you can mourn at." In his rebuttal closing argument, Stoner's attorney stated: "[Stoner] needed help and went to a place that promised to help her, and they betrayed her and took from her the most precious thing she ever had, her firstborn child, because someone set themselves up as god to declare what was in the best interests of this child." Thus, the only injury alleged and argued by Stoner was the personal injury she suffered as the result of the loss of her child. Pursuant to the primary rights theory, Stoner suffered only one "injury" and she had only a single cause of action for personal injury because of fraud. The existence of multiple legal theories (e.g., intentional misrepresentation, concealment or negligent misrepresentation) or multiple, alternative fraudulent acts (i.e., the seven fraudulent acts set forth in modified BAJI No. 2.60) does not alter this conclusion. There remained only a single cause of action.[14] Williams fails to reveal any other independent "injury" suffered by Stoner which would support a finding of another cause of action. Accordingly, we conclude the court did not err by instructing the jurors they were not required to agree on the same fraudulent act so long as at least nine of twelve jurors agreed that each of the elements of fraud was proved by a preponderance of the evidence.

II

*The Court Did Not Abuse Its Discretion by Admitting Evidence Relating to Matters Not Specifically Alleged in Stoner's Complaint*

Williams contends the court abused its discretion by allowing into evidence testimony regarding matters not specifically alleged in Stoner's

---

[14]Without any reference to the primary rights theory, the court in *Conger* v. *White* (1945) 69 Cal.App.2d 28, 41 [158 P.2d 415], held that a series of fraudulent acts that were part of a single scheme to defraud the plaintiff stated a single cause of action. The *Congor* court reasoned: "All of the acts of defendants were alleged to have been done in pursuance of this common purpose and design. . . . The three transactions were so closely related as to time and as to the manner of their accomplishment as to indicate that each activity was a part of the original plan and not a new one. That, at least, was the theory of the complaint, which alleged the development of the scheme step by step, and the proof followed the same pattern. The complaint stated but a single cause of action for fraud. *In an action for damages for fraud, a complaint which alleges a series of fraudulent acts committed in the execution of an entire scheme to divest plaintiff of his property states a single cause of action.* [Citations.]" (*Ibid.,* italics added.) This holding supports our conclusion.

complaint. Specifically, she asserts the court erred by allowing the testimony of Annette Baran (Baran), Stoner's expert witness on adoption procedures, regarding certain duties of disclosure. Williams argues this testimony exceeded the scope of the four specific allegations of affirmative misrepresentations contained in Stoner's complaint, and her objection to such testimony should have been sustained by the court. The court overruled her objection and Baran testified, among other things, concerning (1) the duty to disclose the difference between an agency adoption and an independent adoption, (2) whether Williams owed Stoner duties of disclosure and confidentiality, and (3) whether Williams owed Stoner a duty to disclose the nature of the documents Stoner signed.

We conclude the testimony allowed by the court did not vary from the allegations contained in Stoner's complaint to the extent that Williams was prejudicially misled. (§ 469; *Franz* v. *Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 143-144 [181 Cal.Rptr. 732, 642 P.2d 792].) ■ Although allegations of fraud generally must be specifically pleaded (see, e.g., *Scafidi* v. *Western Loan & Bldg. Co.* (1946) 72 Cal.App.2d 550, 553 [165 P.2d 260]), a plaintiff is not forever constrained to allegations set forth in a complaint. Rather, as pretrial discovery and revelations during trial give rise to new factual allegations which are not materially different from those contained in the complaint, a court has the discretion to allow the additional evidence as the trial court did in the case at hand. Furthermore, pleading of a representative selection of alleged fraudulent acts often will suffice. (*Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 218 [197 Cal.Rptr. 783, 673 P.2d 660].)

■ We further note that the three specific areas of Baran's testimony to which Williams objects are closely related to the fraudulent acts alleged in Stoner's complaint. Testimony about a duty to disclose the difference between agency and independent adoptions not only was important for the jury's understanding of the case as a whole but also related to the complaint's allegation that SDPS was a licensed agency authorized to provide objective and accurate information on the full range of alternatives available to pregnant women. Testimony about whether Williams owed Stoner duties of disclosure and confidentiality related closely to the complaint's allegation that Williams represented to Stoner that any information revealed by Stoner would be kept fully confidential. Testimony regarding Williams's duty to disclose the nature of the documents signed by Stoner directly related to the complaint's allegation that Williams represented the documents to be mere formalities and were for Stoner's benefit. Thus, the trial court did not abuse its discretion by allowing this testimony.

■ Williams also contends the court abused its discretion by allowing Stoner to include in modified BAJI No. 2.60 three other alleged fraudulent

acts or omissions in addition to the four fraudulent acts specifically alleged in the complaint. However, after considering the evidence revealed at trial which was closely related to the four originally alleged fraudulent acts, we conclude the court did not abuse its discretion by allowing these additional acts or omissions to be alleged. In so doing, the court allowed Stoner effectively to amend her complaint to conform to the proof at trial. Although Stoner did not formally move to conform her complaint to the proof at trial, the court effectively granted such a motion when it accepted Stoner's modified BAJI No. 2.60 instruction. (Cf. §§ 473, 576.) Further, Williams did not object to any supposed lack of compliance with technical pleading rules, and, even if she had, we would conclude the error was harmless.

DISPOSITION

The judgment is affirmed.

Work, Acting P. J., and Huffman, J., concurred.